Today's cases will be called as previously announced, and the times will be as allotted to counsel. The first case today is number 22-1420 and number 22-1619, United States v. Joseph A. Foistner. At this time, would counsel for the appellant introduce himself on the record to begin? May I please report, my name is Lawrence Gersoff. I represent Joseph Foistner. I did not have anything to do with representing him below. Excuse me, it'll help if I think you pull the microphone a little bit closer. Okay. Is that better, Judge? That's better, yes. Okay, very good. My wife accuses me of mumbling all the time, so I guess it's true. Speak up, though. As I said, I had nothing to do with the proceedings below. And, Judge Kayada, if I may, I would like to reserve three minutes of rebuttal time. Three minutes, yes, you may. Your Honors, there are two issues in this appeal. The first is, did Mr. Foistner receive a fair trial? And the second issue is, was the restitution order for millions of dollars entered without a hearing, which was a reversible error on the part of the district judge? I would like to address first whether Mr. Foistner received a fair trial. We all know that this was a pro se bench trial. And it became a little complicated, shall we say, because of that. And I think it's fair to say that the judge below might have taken some liberties with what he said and how he handled the case because there was no jury there, and perhaps because Mr. Foistner was a member of the bar. I don't frankly remember whether he had been disbarred by then or not, but had been a member of the bar. The first thing is that the judge expressed his repeated frustration with delays. And Mr. Foistner did move for a number of delays in the trial. However, it was really the fault of the COVID pandemic that caused the delays in the trial. If you look at the record, most of the delays were during the worst part of the pandemic and had nothing to do with Mr. Foistner. Second of all, as you will recall, Mr. Foistner had an expert witness, and that expert witness was, in his view, critical to the presentation of his case. That expert witness also got COVID, and there was a concern that he would not be able to participate in helping Mr. Foistner defend the case. But, counsel, there are long exchanges in the record where Judge Barbadaro is acutely aware of the health issues of the expert, and he's trying every which way to accommodate his illness. They talk about, I mean, there's this issue of he has to be there to see the government's case, right? I mean, he insisted on that. And so Judge Barbadaro tries to work out an arrangement whereby the government's case can be put on Zoom so that he can watch it, I guess, at home while he's recovering. And then he tries to accommodate his schedule when he can personally be there to testify. So, I mean, the record, I would suggest, belies what you're saying. The judge is going out of his way to try to accommodate this witness that your client says was so critical to his case. Well, what my client says, Judge, and I think it's a fair point that he makes, is that the expert witness was not only critical in terms of his testimony, but was critical in terms of helping Mr. Foistner with the entire case, analyze the direct testimony of the government's witnesses and so forth. And they both felt, both the witness and Mr. Foistner, felt that it was difficult, if not impossible, to do that over Zoom. I remember in my own... But, Counselor, typically pretrial discovery is exchanged, which assists the expert witness in understanding the government's case. I missed the first part of the question, Judge. I said typically pretrial discovery, even in criminal proceedings, because there's an exchange of information... Yes, Your Honor. ...allows a witness, such as this expert witness, to become familiar with the government's theory of the case. That's true. And any opinions that the government may be offering to prove the case. So I don't understand how your client was disadvantaged. Well, he was counting on the expert witness to be, in essence, his second seat, since he was trying the case pro se. Well, he did have standby counsel. Well, he did have standby counsel, but he was somewhat disenchanted with standby counsel, and he was counting on his expert witness to really play that role, at least with regard to that aspect of the testimony. So tell us what question on cross-examination would have been asked had the expert been present but was not asked. Well, Judge, I'd love to be able to do that. I can't specify a specific question that would have been asked, and it's not necessarily the case that that's the problem. That because the expert witness was not physically there, a question didn't get asked. It might have been some kind of tactical decision or some kind of. . . Well, what type of tactical decision was made that would not have been made or that was not made that could have been made had the expert been there? Even if we were to accept the proposition, which I'm not suggesting we do, that he had to postpone the trial, the judge had to postpone the trial, you've got to show prejudice, and I found nothing in your brief. It just says he wanted to have the guy there, period. Well, respectfully, I think the prejudice was that he didn't have the full assistance. I don't think the test is. . . Give us an example. Give me a question that he would have asked. Tell me how this would have played out differently had he been there. That's sort of like proving a negative. I can't tell you that had this happened, a particular question would have been asked. But unfortunately, the burden is on you to show how you were prejudiced. Yes, Your Honor, and the prejudice is that he didn't have the assistance of this very talented expert at the trial and that the expert. . . Do you have to support the proposition that the expert would have even been allowed to be at counsel table as opposed to in the back of the courtroom where he couldn't provide moment-by-moment assistance? Well, Your Honor, I think the fact that it was a non-jury trial, which has more leeway, obviously in a jury trial a witness would not be allowed to sit in the courtroom and listen to the testimony of other witnesses so that that witness could not tailor his or her testimony to the. . . I think your time is up, but you have reserved three minutes. Very well, Judge, thank you. Thank you, Counsel. At this time, if Counsel for the Appelee will introduce himself on the record to begin. May it please the Court, Alexander Chen for the United States. This is a case where the trial judge constantly tried to help a challenging pro se defendant focus on the heart of the case. Now, the defendant was charged with lying to get particular loans, but after three and a half years of protracted litigation, it was very clear that he was obsessed with trying to air two decades' worth of grievances against parties from the past instead of actually refuting the government's case. To his credit, the trial judge, as Judge Pez noted, bent over backwards. Throughout the trial, the government decided multiple times where the trial judge gave the defendant a roadmap to create reasonable doubt. He warned the pro se defendant when he was veering off track into irrelevant topics, which was quite often, and at times the judge intervened appropriately to stop the defendant from going off the rails. None of the conduct described in the defense briefing demonstrates an abuse of discretion, let alone the bias that he has to show in order to get a new trial. Now, I'm going to turn briefly to, since the topic of the expert witness came up, I'll just briefly address that. There's a couple issues with that line of argument. First of all, the expert's testimony was largely irrelevant to the case. The expert's testimony was port of the limit to the proposition that entities can use accrual accounting to prepare the taxes and that individuals can use carry-forward losses to offset future tax liability. That was totally irrelevant to the government's case. The theory that the government advanced on was that the defendant did not have any law firm. He did not have any clients. Therefore, all the income that he reported on the tax returns was fictional. And moreover, as the court noted, even if the expert had any relevant testimony, the judge, Judge Barbadero, offered a solution. He gave the defendant and his expert a chance to watch the trial proceedings on Zoom and to postpone the expert's testimony until he felt available and healthy enough to testify. Both the defendant and the expert agreed, and there was no further objection. And while the defendant repeatedly emphasizes in his briefing for this panel today that the expert had important expertise to offer the court, of course, at trial, the defendant did not ask the witness, expert witness, any relevant questions. He often tried to go into topics beyond the expert disclosure, which, of course, the trial judge appropriately prohibited. Counsel, can I ask you about the restitution issue? And perhaps opposing counsel might want to use rebuttal time to address that. There's a striking disparity between the appraisals that were available a number of years before the property was sold in an attempt to try to recover some of the losses from the bank. I mean, it's in the neighborhood of $5 or $6 million, is it not? I mean, almost on its face, that suggests that there was some problem with the handling of the property by the trustee and perhaps even by the bank, that there could be such a stunning diminution in value over a period of, I guess, about four or five years. Isn't that, on its face, somewhat problematic and perhaps there should have been an evidentiary hearing to find out why that happened? Because I would agree that at some point there is possibly to be such a stunning disparity between an appraisal and the actual selling price that it could warrant an evidentiary hearing. But in this case, what the record shows was that Mr. Feusner did offer one appraisal of the Foxbury Drive property worth approximately $7 million. No lender ever relied on that appraisal. The highest value appraisal of the property that was relied on by North American Savings Bank was, I think, about $3.6 or $3.7 million. And even assuming that was a fair market price back in 2015, I think when the appraisal actually went through in 2014, the Supreme Court in Rovers has told us that the true value, the appropriate value of collateral is the fair market value of when the collateral is sold. Now, what happened here is that you have a large piece of property. Real property, by its nature, is somewhat illiquid. Once Mr. Feusner declared bankruptcy in 2017, the trustee and the bank tried to maximize the recovery. They are trying to recover as much money as they can from the property because the odds of recovery from Mr. Feusner are extremely low. Over time, there's no individual on the open market willing to pay $3 million, $2 million, or even $1.5 million to this property. And after four years, it finally sells for $1 million. Was there any assertion of mismanagement of the property by the trustee or the bank? And I don't mean generalities. Was there any specific information that, for instance, in the winter, the pipes were allowed to burst while it was under their custody? Mr. Feusner below never made such an allegation. The only allegation was a general assertion of mismanagement and waste by the trustee and the bank after his conviction. And was the allegation that he's even making now, as I understand it, is that the pipes froze when the trustee had control over the property? Why would that be the bank's problem? So at some point, my understanding is the trustee abandoned the property and it— Well, suppose the trustee burnt down the property. Came out one night and burnt it down intentionally. Why would that be the bank's— wouldn't that be as if the debtor lost control of the property and it was damaged and so the collateral is worth less, so the bank gets less, so the deficiency is more? I think in that case, let's say the trustee burned down the property, that would be a break in the causal chain under this Court's precedence in Ropers. In that case, the defendant would certainly have a much stronger argument, but that's not what happened here, of course. What if the defendant had the property and it burnt down? Are you saying that would be a break in the causal chain? No, accidentally. Oh, if he accidentally burnt down the property? Yeah. Or some neighbor burnt it down. Why does the bank suddenly lose its moan? So the—in this hypothetical, if the house burned down accidentally, I think that— While it's in possession of the debtor. Sure, if the bank took it over and it burnt down, that could be the bank's problem, but I was very puzzled by your seeming agreement that if it burnt down while the trustee had it or if the pipes froze while the trustee had it, that that's the bank's problem. Sorry, I misunderstood you, Judge Piatta. What I intended to say was if it was intentional waste, for example, if the trustee intentionally had burnt the house down, then yes, it would— That's the bank's problem? No, that would certainly—that would break the causal chain. I think that we would have to have further—we would have to have a further hearing of that. Well, by break the causal chain, you mean the bank loses its collateral and doesn't get to recover cash for it. That's quite extraordinary. No, I would not agree with that, Judge Piatta, and I apologize if you understood me to argue— So what do you mean by break the causal chain? There is a point—again, this is all very fact-specific— not at fault for whatever the reason was for the loss in the fair market value of the property. At that point, if the defendant can provide specific facts, that would warrant an evidentiary hearing for the judge to make a determination as to the appropriate loss attributable to the defendant. And what law tells us that if a loss occurs other than after the creditor has taken possession of the collateral, that somehow that destroys the creditor's ability to recover the deficiency? Your Honor, I do not know off the top of my head. I'm happy to do additional research and get back to the Court. But to be clear, you're conceding that point. Your Honor, I think just to clarify, I think the point I'm agreeing with is if— the point I would agree is that if a trustee intentionally damages the property or allows waste to happen without doing anything to intervene, that would warrant an evidentiary hearing. Thank you. If there are no further questions, the Governor will rest on the briefs. Thank you. Thank you, Counsel. At this time, if Counsel for the Appellant would please reintroduce himself on the record. He has a three-minute rebuttal. Again, may it please the Court, my name is Lawrence Berzaga. I represent Joseph Boisner. I think Your Honors have brought up a very good point that I didn't get a chance to get to in my main argument. The discrepancy here between the highest valuation and even the considerably lower valuations that my colleague has suggested came later almost demands a hearing. How did that happen? Why is that the case? If there had been a $10,000 discrepancy, if there had been even a $100,000 discrepancy. But discrepancy, when you say discrepancy, to be clear, you're comparing the amount realized in the foreclosure sale to the amount in an appraisal furnished by your client. Well, one of them was furnished by my client. I believe other ones were more, had other input. They weren't all furnished by my client. The ones that weren't from your client, what was the extent of the discrepancy? Millions of dollars. I couldn't give you a... Well, this was a multimillion-dollar property, so when you say millions, was it... Three, two, three, four million dollars, as opposed to, I think, the $7 million that my client had initially claimed. And was... Go ahead. Was there any evidence at all put forward that there was any mismanagement of the asset by the creditor? By the creditor. No, Mr. Foistner did not issue any kind of complaint. But then again, Mr. Foistner was not in charge of the property. He would have had to drive by the property... Did he offer any evidence that there was any mismanagement by anyone? Where would that evidence have come from, Judge? I'm just asking if he offered any. I beg your pardon? I'm just asking if he... As I understand, he did not offer any. No, he did not offer any, but he would not have had any to offer. Well, he could have talked to the trustee, right? Well, he could talk to the trustee, but the trustee... But he could talk to the trustee to find out something very simple as to, did the pipes burst? Is the house in the same condition as it was when I filed for bankruptcy and put it in your hands? He could have... He could have asked that. The trustee would have had no obligation to answer. But he would have had no reason not to answer. Judge, I can't tell you... The trustee has a fiduciary responsibility to the court. I can't tell you what exactly would have happened. Well, what is your theory as to what accounts for the diminution in value? My theory is, I mean, I understand that the real estate markets go up and down. I understand that at any given time, the same house can be worth significantly different. What is your theory for what accounts for the diminution in value? If you're saying market forces, which is how you started your answer, market forces doesn't account for any kind of mismanagement. What I'm saying is the lack of care. But based upon what evidence? Based upon the condition of the property, based upon the fact that the valuation realized was so significant and dramatically there's no evidence that the market had diminished that much. And honestly, a hearing would have taken, what, one day, less than a day? And all of this would be resolved. There would be some testimony. There would be what was it worth at a certain point in time. Was there, in fact, a diminution of value? Why was there a diminution of value? And then the judge could have made an informed decision. If we, as I understand it, your client made no proffer of any evidence that he would submit at a hearing. Rather, he seems to say there should have been a hearing so he could engage in some type of discovery to find out how you account for the discrepancy. Or at least have a judicial ruling as to why the discrepancy was so wide. As one of your honors pointed out, it's a dramatic, dramatic discrepancy. Counsel, you're really swimming against the tide here. I mean, the law is pretty basic. It's an abuse of discretion standard. Evidentiary hearings are the exception. You really have to go beyond, as my colleagues are pointing out, speculation that there might have been waste, mismanagement. You've got to have some, you have to be able to offer some specifics, not just speculation that it might have happened. You can't use the evidentiary hearing for the purpose of discovery, which it sounds like that's what your client was trying to do. He had a theory, and he wanted to test it at an evidentiary hearing. But you don't get an evidentiary hearing to test a speculative theory about what might have happened. That's just not how it works. Your Honor, respectfully, I think he had more than a theory. He had a property that was worth several million dollars that sold for a million dollars. That's evidence enough to call for a hearing. He didn't have to say, you know, they didn't fix the fence, they didn't paint the attic, whatever. But that diminution of value is so dramatic that somebody should have explained it, and there should have been some kind of evidentiary hearing so that this issue would have gone away with a day's testimony. And there was no reason for the district judge. I think, frankly, the district judge, and I really, with all due respect to him, may have just been frustrated at this point by the length of the proceedings and everything else and may have just said, you know, enough already with these hearings. Are there any further questions? Thank you. Thank you. Thank you, counsel. That concludes argument in this case.